**Elizabeth G. Jamerson**
**Lafayette S. Jamerson, Jr.** as Individual and
Intended beneficiary and General Contractor
In Pro Per
3200 Harrison Street
San Francisco, CA 94110
(415) 821-7600 Phone
(415) 826-7600 Fax



# IN THE UNITED STATES DISTRICT COURT

# FOR NORTHERN CALIFORNIA

**LAFAYETTE S. JAMERSON,** as an
individual and dba JAMERSON
CONTRACTORS, a licensed California
General Contractor;

                Petitioners

v.

**City and County of SAN FRANCISCO**
through, Frank Y. Chiu, Director, *Dept of
Building Inspection*; LAWRENCE
BADINDER, *Zoning Administrator*; and
Does 1-100 inclusive.
                Defendants

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**CV-04336 VRW**

SUPPLEMENTAL COMPLAINT
SUPPLEMENTAL PLEADING FRCP 15(d) FAC
(EXHIBIT A, FAC).

SIX CAUSES OF ACTION OF
**(1) CIVIL RIGHTS VIOLATIONS 42 U.S.C.A.
§ 1983. Discrimination, Unequal Treatment
Abrogation of Procedural Due Process and of
Substantive Due Process** U.S. Constitution
Amend. V, XIV; CCC §51-54

**(2) CONVERSION OF PROPERTY**
     **(CC 1573, 1709, 3391(1))**

**(3) CONSTRUCTIVE FRAUD (CC 1709)**

**(4) NEGLIGENT SUPERVISION OF
MUNICIPAL EMPLOYEES.**

**(5) NEGLIGENT INFLICTION OF
EMOTIONAL DISTRESS and MENTAL
SUFFERING.**

**(6) TORTUOUS INTERFERENCE WITH
AND IMPAIRMENT OF PROSPECTIVE
BUSINESS ADVANTAGE FRCP 16, 10(a-c)
(7) CONSPIRACY (Federal Practice Civ 1506)**

**Demand for a Trial by Jury** FRC 65(a)
Judge Vaughn R. Walker
U.S. District Court, Northern California

Supplemental Motion                 Page 1 of 6

1  PLAINTIFF'S SUPPLEMENTAL COMPLAINT/PLEADING under FRCP 15(d)

2  INTRODUCTION

3  Comes now Plaintiff Lafayette Jamerson, dba Jamerson Contractors with his Supplemental

4  Pleading/Complaint. Plaintiff here now re alleges all causes, facts, allegations, exhibits of (FAC)

5  filed April 22 2002.

6        Plaintiff invokes to extent possible, Judicial Notice[1] of the docket, filings, transcripts, and

7  Orders of SF Superior Court's Probate Court Division Case No. 240746. Also those filings in a

8  NEW Related-Case [plaintiff US Bank "Trust"] San Francisco Superior Court, 1st Appellate

9  Division District 3 filings in case No. A112770 (related case). This Supplemental

10  Pleading/Complaint has new allegations of <u>facts, transactions, occurrences and events</u> relevant. All

11  allegations herein unmask continuing discrimination (42 USC 1983 et.seq.) and other common law

12  violations concomitant. Also Case A-112770 and A-112770[2] is a related and highly correlated

13  cases.

14  **(1) CIVIL RIGHTS VIOLATIONS 42 USC § 1983, US CONSTITUTION V, XIV; CCC §51-**

15  **54.**

16        Jamerson's 42 USC 1983 Discrimination claims and allegations <u>proceed, include</u> and

17  <u>succeed</u> the Board of Appeals LCU Termination aptly dissected in portions of previous Court

18  Orders of VRW pages 2, 7, 8. Plaintiff re-alleges 42 USC §1983 Discrimination has occurred

19  before, during and after the Board of Appeals LCU termination appearances. Let us go straight to

20  the new <u>FACTS, TRANSACTIONS, OCCURANCES AND EVENTS</u> since filing of FAC

21  (4/22/2002); supporting causes 1-6. Adding is Cause No. 7, pursuant to Civ 1506.

22  CHRONOLOGICAL SYNOPSIS NEW SINCE THE FAC OF 4/22/2002 supporting all filings and

23  arguments preceding and incorporated herein jointly and severally.

24

25      [1]See Judicial Notice Request, (page ____ )

26      [2]Credit Suisse vs. Estate and Co-Conservators for Elizabeth G. Jamerson US Bank- Trustee

27

1    Since the 2002 FAC, Defendants named and 'Does' known and unknown have worked
2  continuing schemes illegal by deceiving Probate Court, circumventing Statutes of California and
3  proceedings beginning with a bogus 'Medical 'Emergency' and 'care' Emergency to person of
4  Elizabeth G. Jamerson and to her Estate by a bogus "Red herring" of insolvency.[3] These mislead the
5  Probate Court to err and wrongdoings to continue to allow a conspiracy and fraud through which
6  deception[4] pervaded.

7  FACTS

8    After 18 years, Alice R. Lane was removed as conservator of the Estate of Elizabeth G.
9  Jamerson; a court-appointed Interim Successor was appointed then over Plaintiff Jamerson's legal
10 objections on June 6, 2003. Discriminatory intimidation of Lafayette Jamerson continued under
11 Interim Successor Conservator :

12        i.   To be repeatedly denied "Interested Party" status at Probate Court hearings.

13        ii.  to give up keys to estate properties.

14        iii. To go to Jail.

15        iv.  a conspiracy was unveiled.

16        v.   non-standard accounting method systems revealed.

17        vi.  Seventh Cause, Conspiracy became clearer.

18 Plaintiff repeatedly, formally and legally filed motions for Status and was repeatedly denied
19 Interested Party status by order of Probate Court Judge. **This is significant lower court error.**

20    Two Nephews were appointed Co-Conservators about 6 months later, over Lafayette
21 Jamerson's legally filed oppositions, which pointed out non-adherence to Cal Probate Statutes:

22        i.   No special Notices to plaintiff.

23

24        [3]These are seen in Probate Docket s.

25        [4]App. Dist. Brief Statement of Facts, lines 21 through 28, shows US Bank spotted the deception
26 through they only had $1,086,000.00 at risk. Plaintiff Jamerson's discrimination cause shows
27 defendants' illegal dissipation of estate of EG Jamerson is over $five million dollars.

28 Supplemental Motion                    Page 3 of 6

1    ii.   Repeatedly denied standing.

2         Since their appointments the current Co-Conservators have lost by mismanagement over a
3    million in cash and squander $6 million - $8 million FMV of estate of Elizabeth G. Jamerson 's real
4    property estate.  This as unwitting "agents" of the Named Defendants and 'Does'.  Within two
5    years Liquid Assets were wasted (spent) of over $1.6 million unnecessarily and wastefully.  Plaintiff
6    alleges a conspiratorial scheme, engineered from above Probate Court engineered by the named
7    defendants and a covert cabal of "Does." Again, Plaintiff alleges that a conspiracy  engineered by
8    Defendants, Probate Court appointees, agents and 'Does' evaded intent and circumvented Probate
9    Statutes, fraudulently and knowingly with Racially Discriminatory purposes (42 USC 1983-1999).

10        Credit Suisse/US Bank Complaint (A-112770) and Appeals extrinsically confirms that. Their
11   similar difficulties with getting justice speaks for itself, to be specific:.

12        **A legally potent countervailing force, the US Bank as "Trustee" for Credit Suisse Bank**
13   **caught up to Co-Conservators. The US Bank alleges in Probate Court and now Appellate**
14   **Court filings that Co-Conservators had illegally used over $1 million dollars to buy out-of-**
15   **state property in Oklahoma, USA, this instead of re-paying US Bank a due mortgage of**
16   **$1,085,000.00! Amazingly, San Francisco Probate Court denied all of US Bank motions, to**
17   **intervene  giving US Bank et.al. nearly the same stone-wall treatment that Plaintiff Jamerson**
18   **has received during 2003-2006 in  Probate Court.**

19        However US Bank had, unlike Plaintiff Jamerson, the financial resources and a General
20   Counsel's staff to go to Appellate Division of the California Superior Court. US Bank as "Trustee,"
21   there alleging similar wrongdoings to plaintiff  albeit in softer terms, e.g. Deception by
22   misrepresentations.  Jamerson, is alleging a  higher order conspiracy reaching above Probate Court
23   and including "Does" unknown as well as named defendants. The US Bank allegations alone of
24   wrongdoings and misrepresentation  combined with Plaintiff Jamerson's corroborating previous and
25   present allegations support his Six Causes, collaterally and directly. Plaintiff so alleges. Pray Court
26   concur.

27   CONSTRUCTIVE FRAUD

28   Supplemental Motion                    Page 4 of 6

1          Lastly, tortuous maneuvering in Probate Court with Statutes, agents, appointees and'Does,'[5]

2  defendants demolished most of the estate of Elizabeth G. Jamerson with a continuing nefarious

3  psychedelic discriminatory covert financial scheme dating back to BEFORE the Limited

4  Commercial Use (LCU) termination of 02/2003. The Termination Notice was, at first, just the only

5  DOCUMENTED clue to existence of a conspiracy- a discriminatory conspiracy of Defendants,

6  named and DOES. It was the chronological focus of FAC.

7  JUDICIAL NOTICE REQUEST

8          The volume of Probate filings is huge. As the Probate Court Docket shows- [see Exhibit C].

9  Lafayette Jamerson, plaintiff has circled those Probate Court Docket numbers considered adequate

10 to establish Facts Sufficient to grant this motion. Judicial Notice of all the Probate filings,

11 transcripts and hearings Under Case No. 240746 and 289470 (trust) in Probate Court, Judicial

12 Notice is requested. See Judicial Notice Request. Or, in the alternative to add selected Probate

13 Court filings by addendum to SAC[6].

14 CONCLUSION

15         Plaintiff has herein shown by allegations and new facts, cases above and by the selected

16 exhibits much new factual evidence of continuing illegal complex legal-financial scheme; much of

17 which is revealed in the adversarial filings of the Probate Court June, 2003 through 2006. e.g.,

18 Selected filings of Probate Docket. It is also psychedelically (intermittently) revealed by fact that

19 US Bank "Trustee" has had to challenge in Probate Court Division and Appellate Court; The

20 $1,085,000.00 conversion of Estate Cash was just the cash, stock portion of a real property estate.

21         Here's "smoke and fire." The magnitude of the US Bank allegations, as new major player

22 **corroborate** Lafayette S. Jamerson's Claims; the latter has been excluded as an "Interested Party"

23 repeatedly in hearings in Probate Court on his mother's estate, to which he and his sisters are heirs.

24 _____

25        [5]This 15(d) filing broadens, 'Does' now named are P.E. Freeman, JD, the appraiser and

26 unknown 'Does' to be revealed.

27        [6]SAC ( Second Amended Complaint).

28 Supplemental Motion             Page 5 of 6

1 Thus excluded (allegedly by Fraud) he is being methodically disenfranchised. Plaintiff alleges 42

2 USC §1983 violations based on race.

3     Repeatedly, though he has filed proper "Special Notices" which are on file with Probate. He

4 did not receive and is not receiving any of critical mailings and the result is he's been excluded

5 from critical hearings. Plaintiff alleges Defendants are responsible for the mis-conduct advertent or

6 inadvertent (CCP 475) of Probate Officers, appointees and experts allegedly beginning with Patricia

7 E. Freeman, JD, as 'agent' of Does unknown.

8     A known heir is being excluded from hearings and Notices on a defacto conversion by CCSF

9 and 'Does.' The US Bank alleges it is being de facto defrauded by Defendants including Co-

10 Conservators of the $1,058,000.00 dollars plus interest owed on mortgage of a sold estate property.

11 This by misleading the Probate Court as Jamerson plaintiff, also alleges.

12 SYNOPSIS

13     Defendants have circumvented existing laws, including 42 USC §1983, to the great

14 detriment of plaintiffs and continue to do so as the first amended claim FAC alleges. More recently

15 additional defendants, known and 'Does' have been revealed as manipulators to circumnavigate the

16 Probate Code of California. These circumnavigations and manipulations are tips of icebergs visible

17 and understandable from the explicit knowledge of Lafayette Jamerson.

18 **DECLARATION and VERIFICATION**

19     I avow this Supplemental Complaint and all accompanying papers are true based on personal

20 knowledge not belief. To the extent they are based on belief, I believe them to be true in the Federal

21 Claim. In this Petition all is knowledge; saved if opinion, and if opinion it is based on true belief.

22 Date: April 9 , 2008    By: _____

    Lafayette S. Jamerson, Plaintiff , Per Se

23

24 *FINANCIAL FOOTNOTE (Damages Financial)*

25 *Estate's (FMV-DBT) = $2million dollars estimated FMV total as of January, 2006 plus interest prejudgement and post-judgement. This is Three Heirs Estate's mid-range seven million Fair Market Value FMV minus the $5 million Debt extant when the Defendants' Bogus Emergency misrepresentation and Bogus Insolvency were engineered by*

26 *the Co-Conspirators, Defendants, CCSF and 'Does.' Three divided equally, per stipes, among 3 heirs, (one son, two daughters of Elizabeth G. Jamerson, their natural mother) Equals $2 million (FMV- DBT) /3.*

27

28 Supplemental Motion              Page 6 of 6

# PROOF OF SERVICE

I, Raymond Norton, declare that I am over the age of eighteen and not a party to this action, that my business address is 3200 Harrison Street, San Francisco, CA 94110, and that, on April 9, 2008, I served copies of the following documents by placing a true copy thereof enclosed in a sealed envelope with postage thereon fully prepaid, in the US mail:

## PLAINTIFF'S REQUEST MOTION FOR LEAVE TO FILE SUPPLEMENTAL ......

## SECOND AMENDED COMPLAINT SUPPLEMENTAL PLEADING

Sherri Sokeland Kaiser, Deputy City Attorney
Office of the City Attorney of San Francisco
1390 Market Street
San Francisco, CA 94102

I caused a true and correct copy of the above document, by following ordinary business practices to be placed and sealed in an envelop for collection and mailing with the US Postal Service.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that this declaration was executed on, April 9, 2008, at San Francisco, California.

Raymond Norton

# S.F. moves to stem African American exodus

Critics say effort to reverse longtime trend may be too late

*By Leslie Fulbright*
CHRONICLE STAFF WRITER

Joseph Blue has lived in San Francisco for 20 years and toughed out the drastic decline in its black population, a phenomenon that persists despite being recognized for decades as a problem.

Neighborhoods that once thrived with African American culture and black-owned businesses have all but disappeared.

"San Francisco no longer has a viable black community," said Blue, an African American who lives in the Western Addition. "The middle class is gone, and what we have left is underprivileged, uneducated, poor black folks."

San Francisco officials are now calling the thousands of black people who have moved away "the African American diaspora," and the mayor's office is putting together a task force to figure out what can be done to preserve the remaining black population and cultivate new residents.

San Francisco's black population has dropped from 96,000 — or 13.4 percent of the city — in 1970 to an estimated 47,000 in 2005, about 6.5 percent of city residents, according to the U.S. Census Bureau. African Americans make up about 12.1 percent of the nation's population overall.

"The decline is phenomenal," said Hans Johnson, a demographer with the Public Policy Institute of California.

San Francisco is not alone. From 1995 to 2000, Oakland and neighborhoods of Los Angeles lost tens of thousands of black residents. Not one West Coast city made a list of the nation's top cities for African Americans compiled last year by Black Enterprise magazine based on income potential, the cost of living, proximity to employers and housing costs. Most are in the South and most — coincidentally or not — have black mayors.

"We don't even have any black leaders," said Blue, who unsuccessfully ran for supervisor in 2004. "When I moved here, there was a vibrant and enthusiastic black culture that brought its own ethnic mix and vitality. Now, the culture and the political influence have evaporated. The population is so low that it is beyond saving."

But Seattle and San Diego, which have reputations for being predominately white, had higher percentages of African Americans than San Francisco in 2005, according to the Census Bureau's American Community Survey. In fact, San Francisco has the lowest proportion of black residents of any large city in the United States.

Though San Francisco is still often seen as diverse, it was 53 percent white and 33.5 percent Asian in 2005, with Chinese Americans accounting for about two-thirds of Asian residents.

"This is something the community and the mayor have been concerned about," said Fred Blackwell, director of the Mayor's Office of Community Development. "But we want to approach it in a real thoughtful way, a way that is solution focused."

Supervisor Ross Mirkarimi, whose district includes the Western Addition, said the exodus has been 40 years in the making — and the task force may be too little too late.

"There has been no plan to fix this, and any talk of a roundtable is bothersome because we are well beyond documenting the obvious," Mirkarimi said. "This exodus completely belies our credentials as a progressive city. We need to spend time organizing in the community."

Demographers cite economic success among black residents as the primary reason for the exodus. But others, including those who still live here, say that after redevelopment pushed black people out of the Fillmore district in the late 1950s, there was no longer a strong black neighborhood. The city's black population peaked about 1970, when 13.4 of San Franciscans were black.

Even the Bayview district, still considered predominately black, is not, though it is home to about one-third of the city's black residents. In 2000, Bayview-Hunters Point was 46.9 percent black; 28 percent Asian and Pacific Islander; 4.9 percent white and 16.4 percent Hispanic of any race, according to the census. Many analysts said the Bayview's black population has fallen markedly in the last five years, but no firm count is available.

Oakland and other older cities have seen similar shifts. Oakland's population went from 46.9 percent black in 1980 — when its proportion of African American residents peaked — to 35.7 percent in 2000, according to census counts. The Census Bureau estimates that black people made up between 29 percent and 33.2 percent of Oakland residents in mid-2005.

Johnson, the demographer, said many African Americans leave San Francisco for outlying suburbs when they have the means, just like members of other racial groups, in search of more of the trappings of middle-class life. Although it is virtually impossible to track where people go, he said it is safe to say that Bay Area cities with growing black populations are seeing those gains because of San Francisco's loss.

Most are in the East Bay and North Bay. Vallejo's black population has doubled since 1980 to 26.8 percent. In Pittsburg, the number of African Americans jumped to 19 percent in 2005. Suisun City is 19.3 percent black, and San Leandro's black population went from 1 percent in 1980 to 12.2 percent in 2005 as the small East Bay city grew 21.3 percent overall.

"This is a concern because this city values having a diverse population," said Greg Wagner, a pro-

## Leaving San Francisco

Percentage of population that is black.



Source: U.S. Census Bureau                    The Chronicle



KURT ROGERS / *The Chronicle*

**Joseph Blue** says there is no longer an African American middle-class community in San Francisco.

gram director at SPUR, the San Francisco Planning and Urban Research Association. "But even if you can identify the causes, it is hard to know what you would do to stop it. It is economics combined with cultural things that are tough to sort out. There are restrictions in this state about what you can do that is racially based."

Blackwell, of the mayor's office, is in the process of pulling together prior studies, surveys and needs assessments addressing the issue. He will look at some nationwide practices and then pick a task force, probably in May, to analyze both what is pushing people away from the city and what is pulling them toward other areas.

"We have a lot of information; we don't need to start from scratch," Blackwell said.

On the task force will be San Francisco residents, business leaders, faith groups, community organizations, activists and families who have left.

"We will not only have the established leaders but new voices," he said. "This should not be framed as just stopping the flight. We also need to put a better foot forward in being attractive to families, young professionals and low-income folks. We will look at places that are gaining African American residents, find out what they are doing policy-wise, and replicate it."

The exodus has been coming up in lots of discussions across the city recently because of current and planned development efforts in the Bayview and Hunters Point. The Bayview Reporter runs an article or commentary in nearly every edition about how a proposal for redevelopment and private development at the former Hunters Point Naval Shipyard marks the end of any chance for African Americans to remain in the city.

"All of the city agencies are working to please the big developers and rich communities," said Willie Ratcliff, the paper's editor. "The supervisors want to grab the ground without any consideration for the people who have lived here and suffered through the environment, the shipyard and PG&E."

*E-mail Leslie Fulbright at*

## "The cause is economics combined with cultural things that are tough to sort out."

GREG WAGNER, *the San Francisco Planning and Urban Research Association*

# S.F.'s Hayes Valley, epitome of cool

It's not scary anymore, it's so fly. This is *the* place to eat a cupcake off china, get a facial, learn about sake and have a nightcap at a drag bar.

BY JANIS COOKE NEWMAN
*Special to The Times*

*San Francisco*

MY San Francisco neighborhood is not cool. It is sunny and cheap, but living there conveys zero hipness. So whenever I want to feel cooler than I really am, I give myself a weekend in Hayes Valley, the trendy neighborhood that sprang up after the 1989 Loma Prieta earthquake destroyed the freeway that ran through it. Beneath the elevated concrete ramps, not far from San Francisco's Civic Center, were tree-lined blocks of Victorian row houses.

While the freeway was functioning, the neighborhood — named for Hayes Street, which dissects it — was dangerous. Once the highway was gone, the row houses began to be transformed into wide-windowed shop fronts and art galleries. The neighborhood's former inhabitants, few of whom you would want to encounter after dark, were replaced by 30-somethings who really know how to wear black.

Here's how cool Hayes Valley is. Nothing opens before 11 a.m., so I begin my weekend with brunch at Citizen Cake, because it's impossible not to love a restaurant that encourages me to "Have cake. Eat it." Citizen Cake serves up hip comfort food, like organic grits topped with a poached egg, and just to demonstrate how seriously it takes dessert, the cupcakes are presented on china plates.

After brunch, I like to wander across the street to Friend to check out the latest in modern design — transistor radios made of turquoise rubber, beanbag chairs in bright vinyl, Alessi personal fans that look like google-eyed aliens.

Inspired by Friend's collection of Herman Miller and Philippe Starck objects, I head to Timbuk2, where I can design my own messenger bag. San Francisco-based Timbuk2 began by making indestructible — and great-looking — bags for bike messengers. Now seemingly every San Franciscan with a sense of style uses one to carry an iBook and the newest Dave Eggers tome.

My next stop is Blue Bottle Coffee Kiosk. Blue Bottle, roasted in the East Bay, is easily the best coffee in San Francisco. The company's two stands at the Saturday Ferry Plaza farmers market are always crowded. The Hayes Valley kiosk, no more than a counter tucked into a garage, is generally crowded but more manageable.



## Bay Area hip



DOUG STEVENS *Los Angeles Times*

(2of2)

## GETTING THERE:

**From LAX to San Francisco,** Alaska, American, Frontier and United fly nonstop; America West flies direct (change of planes). From LAX to Oakland, Southwest and United fly nonstop, America West flies direct (change of plane). Restricted fares begin at $98.

## WHERE TO STAY:

**Hayes Valley Inn,** 417 Gough St. at Hayes; (800) 930-7999, www.hayesvalleyinn.com. This European-style hotel is in a restored Victorian. Baths are shared. Rates are $73 to $105, and include continental breakfast.

## WHERE TO EAT:

**Citizen Cake,** 399 Grove St.; (415) 861-2228, www.citizencake.com

**Blue Bottle Coffee Kiosk,** 315 Linden St.; (415) 252-7535, www.bluebottlecoffee.net

**Suppenkuche,** 601 Hayes St. at Laguna; (415) 252-9289, www.suppenkuche.com.

**Marlena's,** 488 Hayes St.; (415) 864-6672

**Modern Tea,** 602 Hayes St.; (415) 626-5406, www.moderntea.com

**Absinthe,** 398 Hayes St.; (415) 551-5127, www.absinthe.com

**Jardiniere,** 300 Grove St.; (415) 861-5555, www.jardiniere.com

**Momi Toby's Revolution Café and Art Bar,** 528 Laguna St.; (415) 626-1508, www.momitobys.com.

## WHERE TO SHOP:

**Friend,** 401 Hayes St.; (415) 552-1717, www.friend-sf.com

**Timbuk2,** 506 Hayes St.; (415) 252-9860, www.timbuk2.com

**Dark Garden — Unique Corsetry,** 321 Linden St.; (415) 431-7684, www.darkgarden.com

**Alla Prima,** 539 Hayes St.; (415) 864-8180

**True Sake,** 560 Hayes St.; (415) 355-9555, www.truesake.com

**Ver Unica,** 437B Hayes St.; (415) 431-0688, www.ver-unica.com

## WHAT TO DO:

**Gaia Tree,** 575 Hayes St.; (415) 255-4848, www.gaiatree.com. An ayurvedic facial is $80.

**Yoga Tree,** 519 Hayes St.; (415) 626-9707, www.yogatreesf.com.

**Tin Horn Public Works,** 511 Laguna St.; (415) 621-1292, www.tinhorngallery.com.

— JANIS COOKE NEWMAN

the shelves of amber bottles and the green devil Absinthe grinning from the wall, this is exactly the place to spend some time before dinner.

Everybody has a special-occasion restaurant, a place where the food, atmosphere and service are always sublime. Jardiniere is mine. Bacon-wrapped quail with creamy polenta. Spring pea flan. Warm banana and bitter chocolate ice cream. All served against a backdrop of sinuous brushed-steel banisters and Art Deco light fixtures. After dinner here, I go back to my less-cool part of the city just happy to live in the same area code.



JANIS COOKE NEWMAN

**A PLACE TO HANG AND HANG ART:** *Momi Toby's is among trendy spots in San Francisco's Hayes Valley.*

**San Francisco**
**Redevelopment Agency**

One South Van Ness Avenue
San Francisco, CA 94103

415.749.2400



GAVIN NEWSOM, Mayor

Richard H. Peterson, Jr., President
London Breed, Vice President
Francee Covington
Leroy King
Ramon E. Romero
Darshan Singh
Benny Y. Yee

Marcia Rosen, Executive Director

April 23, 2007          118-28407-004

FOR PICK UP:  4/23/07

Mr. Jamie Jamerson
3200 Harrison Street
San Francisco, CA 94110

### RE:    Certificates of Preference

Dear Jamerson:

Per your phone message this morning, attached are copies of the two undeliverable email messages sent to you on April 16 and April 20, 2007. Also attached is information regarding the four certificates our Central Records staff was able locate, issued to the Jamerson family. As you requested, this package will be waiting for you to pick up some time today from our reception desk.

If you wish to discuss your Certificate status further, please contact me at your earliest convenience to make an appointment. I can be reached at 415-749-2478.

Sincerely,

Gwen Sebay
Assistant Development Specialist

c:   Chris Harris, SFRA

Gwen Sebay/REDEV/SFGOV
04/20/2007 03:17 PM



To      Jamcom@pacbell.net

cc      Chris Harris/REDEV/SFGOV@SFGOV, Marcia Rosen/REDEV/SFGOV@SFGOV,
        olson.lee@sfgov.org

bcc

Subject   Re: Bus/Residential Cert of Pref. 

Dear Mr. Jamerson,

Per my discussion with you today, I am forwarding my original email sent on April 16, 2007. Shortly after I emailed you on April 16th, our Central Records staff was able to locate information which listed several Certificates for the Jamerson family beginning in 1974: #4520 for furnished rentals at 901-05 McAllister Street; #3050 for furnished rentals at 813 Laguna Street; #3128 for New Laguna Market at 901 McAllister Street; and #4825 issued to you based on your print business. To date, I haven't been able to locate information confirming your residential certificate of preference. I have requested that Central Records staff try and locate any of the certificates listed. I will let you know by letter or email if they have been able to retrieve that information. Meanwhile, and per your request, I will forward to you copies of the documentation I have retrieved so far.

Sincerely,

Gwen Sebay
================================================

Gwenevere P. Sebay, Asst. Development Specialist
San Francisco Redevelopment Agency
Affordable Homeownership Program
415-749-2478 (direct); 415-749-2590 (fax)
www.sfraaffordablehousing.org
* * * * * * * * * * * * * * * * * *

Gwen Sebay/REDEV/SFGOV



Gwen Sebay/REDEV/SFGOV
04/16/2007 10:46 AM

To      Jamcom@pacbell.net

cc      olson.lee@sfgov.org, Marcia Rosen/REDEV/SFGOV@SFGOV, Chris
        Harris/REDEV/SFGOV@SFGOV

Subject   Bus/Residential Cert of Pref.

Dear Mr. Jameson,

Per my discussion with you last Friday, I have checked my database and was unable to find your Business or Residential Certificates using the addresses and business names you have supplied me. Concurrently, I've asked our Central Records staff to double-check this information; they should be getting back to me shortly. Please let me know if the information I have is incorrect and I will check my database again:

Name:   Lafayette (Jamie) Jameson
Mailing Address: 3200 Harrison Street, San Francisco, CA 94101 (P.O. Box 5263)
Displacement Address(es): 817 Laguna Street, 904 Steiner Street
Business Names: Jameson Printing, Jameson Contractors

In the meantime, I put your name back in our mailing list, so you will receive information about upcoming Agency activity. Once I've been able to confirm the status of your information, I will send you a letter with my findings, including information regarding our appeals process, should there be a need for it.

Sincerely,

Gwen Sebay

Gwen Sebay
==============================
Gwenevere P. Sebay, Asst. Development Specialist
San Francisco Redevelopment Agency
Affordable Homeownership Program
415-749-2478 (direct); 415-749-2590 (fax)
www.sfraaffordablehousing.org
* * * * * * * * * * * * * * * * * * * * * * * * *

# First American Title Company
### OF SAN FRANCISCO

DATE February 28, 1985    ORDER NO P-123595-RN    ESCROW OFFICER  Randall Nelson

**ESCROW CLOSING STATEMENT**    BUYER'S    RE:  685 McAllister Street
San Francisco, CA

⌐ ̄ ̄ ̄ ̄ ̄ ̄ ̄ ̄ ̄ ̄ ̄ ̄ ̄ ̄ ̄ ̄ ̄ ̄ ̄ ̄ ̄ ̄ ̄ ̄ ̄ ̄ ̄ ̄ ̄ ̄ ̄ ̄ ̄ ¬

· LUCHAN BAKER and LAVOLIA BAKER
· 1742 Fillmore Street
· San Francisco, CA 94115

| ITEMS | DEBITS | CREDITS |
|---|---|---|
| SALE/PURCHASE PRICE | 168,841.61 | |
| DEPOSITS | | 173,161.71 |
| DEPOSIT RETAINED accrued interest | | 3,531.12 |
| EXISTING LOAN | We certify this to be a true and | |
| NEW LOAN  Additional Advance - Home Federal | correct copy of the original. | 12,000.00 |
| PRO-RATA – TAXES | First American Title Company of San Francisco | |
| – INSURANCE | By | |
| – INTEREST | | |
| – RENTS | | |
| | | |
| TITLE INSURANCE POLICY FOR $ 1,060,000.00 | 2,048.00 | |
| ESCROW FEE | 286.00 | |
| RECONVEYANCE FEE | | |
| PREPARING DOCUMENTS  Notary fee Endorsment 108.8 (#2) | 109.55 | |
| TRANSFER TAX | | |
| RECORDING:  Endorsement 108.8 | 81.00  170.10 | |
| TAX COLLECTOR | | |
| COMMISSION | | |
| INSURANCE | | |
| New Loan fees to Home Federal Savings | | |
| credit report | 30.00 | |
| statement of condition | 50.00 | |
| additional advance | 985.00 | |
| interest | 12,473.64 | |
| attorney's fees | 675.00 | |
| | | |
| CHECK HEREWITH  to buyer's | 2,942.93 | |
| BALANCE DUE | | |
| TOTALS | 188,692.83 | 188,692.83 |

# *First American Title Company*

OF SAN FRANCISCO

DATE February 28, 1985   ORDER NO P-125595-RN   ESCROW OFFICER Randall Nelson

**ESCROW CLOSING STATEMENT**   SELLER'S   RE: 685 McAllister Street
San Francisco, CA

⌐　　　　　　　　　　　　　　　　　　　　　　　¬

ELIZABETH G. JAMERSON
1594 Golden Gate Avenue
San Francisco, CA 94115

L　　　　　　　　　　　　　　　　　　　　　　　⌋

| ITEMS | DEBITS | CREDITS |
|---|---|---|
| **SALE/PURCHASE PRICE** | | 168,841.61 |
| **DEPOSITS** | | |
| **DEPOSIT RETAINED** | | |
| **EXISTING LOAN** | We certify this to be a true and | |
| **NEW LOAN** | correct copy of the original. | |
| | First American Title Company of San Francisco | |
| **PRO-RATA — TAXES** | | |
| — INSURANCE | By _____ | |
| — INTEREST | | |
| — RENTS | | |
| | | |
| **TITLE INSURANCE POLICY FOR $** | | |
| **ESCROW FEE** | | |
| **RECONVEYANCE FEE** | | |
| **PREPARING DOCUMENTS** | | |
| **NOTARY FEE** | | |
| **TRANSFER TAX** | 845.00 | |
| **RECORDING:** | 5.00 | |
| **TAX COLLECTOR** | | |
| 1st Installment 84/85 + Penalty | 1,477.33 | |
| **COMMISSION** | | |
| | | |
| **INSURANCE** | | |
| Pay attorney's fees - Leo E. Arnold, Jr., Esquire | 6,316.00 | |
| Pay CPA fees - Christopher Chime Ogbodo | 790.00 | |
| HOLD demand of Carters Electric | 19,300.00 | |
| | | |
| | | |
| | | |
| **CHECK HEREWITH**   to seller | 140,108.28 | |
| **BALANCE DUE** | | |
| TOTALS | 168,841.61 | 168,841.61 |

# ATTACHMENT

MEMORANDUM

205-44484-002
November 29, 1984

TO:        Agency Commissioners

FROM:      Wilbur W. Hamilton, Executive Director

SUBJECT:   Authorizing the Reinstatement of the Preference
           Certificate of Lafayette Jamerson Exercised in
           Connection with the Agreement for Disposition
           of Land and Improvements for Private Rehabilitation
           of 685-91 McAllister Street, Parcel 785-A(1);
           Western Addition Project Area A-2

## ACTION

At the Agency meeting of December 4, 1984, you will be asked to approve
the reinstatement of the Preference Certificate issued to Lafayette
Jamerson, dba Jamerson Printing Company, and which he exercised in
connection with the Agreement for Disposition of Land and Improvements
for Private Rehabilitation (LDA) of 685-91 McAllister Street, Parcel
785-A(1), in the Western Addition Area A-2. This is a companion item to
the Tenth Amendatory Agreement being recommended under a separate
resolution.

## BACKGROUND

During the public hearing in 1980 at which the Commission originally
considered Mrs. Elizabeth G. Jamerson's offer to purchase the subject
property, Mr. Lafayette Jamerson offered to have his Preference
Certificate exercised in addition to Mrs. Jamerson's certificate as a
condition of approving the LDA with Mrs. Jamerson. Mr. Lafayette
Jamerson's reason for his action was because he had anticipated re-
establishing his printing business in the property following completion
of rehabilitation. The LDA that was then approved therefore provided
for the irrevocable exercise of both the certificates of Mrs. Jamerson
and Mr. Lafayette Jamerson upon conveyance of the property to Mrs.
Jamerson.

However, the benefit that Mr. Jamerson had expected to derive through
the exercise of his certificate (obtaining a tenancy in the
rehabilitated building) will not take place due to the sale of the
property to the Bakers. It is, therefore, recommended that Mr.
Jamerson's Preference Certificate No. 4825 be reinstated effective upon
the conveyance of the property by Mrs. Jamerson to the Bakers, or any
other Agency-approved assignee.

## RECOMMENDATION

Staff recommends your approval of the action requested herein.

Wilbur W. Hamilton
Executive Director

bcc: R. Kernan, L. Mills, L. Borregard, P. Oswald (2), W. Willoughby (2), D. Salvador, R. Kono,
     G. Suttle, L. Cayton, D. Nelson, J. Eng, H. Keyes, S. Hysinger, Brown Act Book

WILBUR W. HAMILTON, Executive Director



LEONARD FENIZTER, Jr. Chair

Mrs. Hazel Lavie, President
Herbert Scott, Vice President
H. James Armes
Charlotte Berk
Sam Blomouist
Hans G. Mardixen
Walter S. Newman

# SAN FRANCISCO REDEVELOPMENT AGENCY

939 ELLIS STREET · SAN FRANCISCO 94109

ADDRESS MAIL TO POST OFFICE BOX 646 · SAN FRANCISCO, CALIFORNIA 94101

(415) 771-8800

REFER TO

August 30, 1983     210-18483-000/999

Mr. Lafayette Jamerson
685 McAllister Street
San Francisco, CA. 94102

Dear Mr. Jamerson:

This is to inform you that your _____ Business _____
(Type of Certificate)

Certificate of Preference Number _____ 4825 _____ has been

exercised based on _____ Rehabilitation Offering #18 _____

Sincerely,

Lee Cayton, Supervisor
Housing Management

CERTIFICATE
PREFERENCE EXERCISED

A2  4825

B1

NAME _Jamerson, Lafayette S._
LAST, FIRST, MIDDLE / 9-29

DBA _Jamerson Printing Co._
30-34

B2
MAILING ADDRESS _P.O. Box 5263, SF, 94101_
STREET 9-36, CITY 37-61, ZIP 62-66

SITE ADDRESS _819 Laguna Street_ BLK _782_ LOT _1_

TYPE BUSINESS _Printing Co._

B4

PREFERENCE CERTIFICATE EXERCISED
_____
DATE 9-14                    STREET 15-42

DESCRIPTION
_____

WESTERN ADDITION A-2
BUSINESS STATEMENT
OF ELIGIBILITY CARD
HM-109-REVISED 4/80

---

B3
CERT.# _4825_ ACTIVE/DATE _6/78_
3-8

CASE.# _225_ INACTIVE/DATE _____
15-19

ACQUISITION DATE _10-31-69_
20-25

S.I. DATE _2-3-77_
26-31

MOVE-IN-DATE _____

---

Jamerson's Certificate was re-instated since 685 McAllister Street
was sold to Luchan and Lavolia Baker and Mr. Jamerson was not going
to be able to re-establish his printing business at this location.

TO FILE:

FROM: Lee Cayton, Supervisor, Housing Management

SUBJECT: CERTIFICATES HELD BY JAMERSON FAMILY

**ATTACHMENT**

On 4-7-80, Gene Suttle, Area Director, Western Addition Two, requested
that a list of certificates issued to the Jamerson family be given to
Mr. Hamilton.

In 1974, Agency went through business claims and issued business certi-
ficates. Certificates returned in the mail were cancelled. In 1978, after
new certificate program became effective, all certificates that had been
cancelled because of non-delivery were re-instated to protect certificate
rights of those who had certificates issued under the old rules.

Mrs. Elizabeth Jamerson had the following certificates issued in 1974
based on business claims paid:

#3049 - furnished rentals at 901-05 McAllister Street.

#3050 - furnished rentals at 813 Laguna Street.

#3128 - New Laguna Market at 901 McAllister Street.

Certificates numbered 3049 and 3050 were returned by the Post Office and were
cancelled as explained above.

#4520 was issued based on a request in 1976 for a furnished rental
business at 903 McAllister Street.

#4825 was issued to Mrs. Jamerson's son, Lafayette Jamerson, based on a
print shop.

When the undelivered certificates were re-instated in 1978, we discovered
that certificate 3049 and 4520 covered the same claim. #3049 was, therefore,
cancelled as a duplicate.

TO RECAP: There are a total of four certificates in force for the
Jamerson family.

210-05480-099
April 8, 1980

TO FILE  -  JAMERSON CERTIFICATES

#3050 - furnished rentals

#3128 - grocery store

#4520 - furnished rentals

#4825 - print shop


No new certificates were issued to the Jamerson family after the
effective date of the new certificate program, April 18, 1978.

Lee Cayton
Supervisor, Housing Management


cc: Earl Mills
    W.W. Hamilton
    Gene Suttle
    Louis Preston